IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION

| | |
|---|---|
| William Reed, Donna Reed, Bonnie Youmans, Jane Yates, Phillip Caulder, all individually and for the benefit and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>Big Water Resort, LLC; TLC Holdings, LLC; Richard Clark; James Thigpen; Jimmy "Steve" Lovell; and Ocoee, LLC,<br><br>Defendants.<br>_____<br><br>TLC Holdings, LLC; Richard Clark; James Thigpen; Jimmy "Steve" Lovell; and Ocoee, LLC,<br><br>Third-Party Plaintiffs,<br><br>v.<br><br>M.B. Hutson a/k/a M.B. Hudson,<br><br>Third-Party Defendant.<br>_____ | C/A: 2:14-1583-DCN-MGB<br><br><br>**REPORT AND RECOMMENDATION OF MAGISTRATE JUDGE** |

This matter is before the Court upon various motions: (a) a Motion for Sanctions filed by Big Water Resort LLC, Richard Clark, Jimmy Lovell, Ocoee LLC, TLC Holdings LLC, James Thigpen (Dkt. No. 179); (b) a Motion for Summary Judgment filed by Richard Clark, Jimmy Lovell, Ocoee LLC, TLC Holdings LLC, James Thigpen (Dkt. No. 183); and (c) a Motion for Summary Judgment filed by M.B. Hutson a/k/a M.B. Hudson (Dkt. No. 228). Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1) and Local Rule 73.02(B)(2)(e), D.S.C., all pretrial matters

in cases involving *pro se* litigants are referred to a United States Magistrate for consideration. A hearing was held before the undersigned on March 16, 2016 at 10:00 a.m. (*See* Dkt. No. 257; Dkt. No. 267.) For the reasons set forth herein, the undersigned recommends denying Third-Party Plaintiffs' Motion for Sanctions (Dkt. No. 179), granting Third-Party Plaintiffs' Motion for Summary Judgment (Dkt. No. 183); and denying Hutson's Motion for Summary Judgment (Dkt. No. 228).

## FACTUAL BACKGROUND

Plaintiffs are all purchasers of memberships in the club known as "Big Water Resort." *(See generally* Am. Compl.) The crux of the dispute between Plaintiffs and Defendants centers upon whether Plaintiffs' memberships in the Big Water Resort, LLC entitled Plaintiffs to the use of a private, members-only resort, or whether that resort could be opened to the public. Plaintiffs contend that they purchased memberships in a private, members-only resort. (*See generally* Am. Compl.) Defendants, on the other hand, contend that the membership agreements "do not promise exclusivity[,] and any evidence to the contrary is inadmissible under the parol evidence rule and under the terms of the merger clause contained in the agreement." (Dkt. No. 88 at 13.) This portion of the dispute has been settled, and on February 1, 2016, Judge Norton entered an Order granting the Motion for Preliminary Approval of the Settlement. (*See* Dkt. No. 248; *see also* Dkt. No. 242.) Ancillary disputes are before the Court today.

Defendants/Third-Party Plaintiffs[1] filed a Third-Party Complaint against Third-Party Defendant M.B. Hutson a/k/a M.B. Hudson (hereinafter "Hutson"). Third-Party Plaintiffs allege that their third-party complaint "arises from . . . Hutson's failure to operate the Big Water Resort

---

[1] Third-Party Plaintiffs are TLC Holdings, LLC; Richard Clark; James Thigpen; Jimmy "Steve" Lovell; and Ocoee, LLC (hereinafter "Third-Party Plaintiffs").

campground in a manner beneficial to the members." (Dkt. No. 72 ¶ 133.) Third-Party Plaintiffs allege that in December of 2010, they sold their membership interests in Big Water Resort, LLC to Hutson, "making Hutson the sole member of that LLC." (*Id*. ¶ 134.) According to Third-Party Plaintiffs, the sale price was $500,000, "of which $499,990 was payable under a promissory note executed by Hutson in favor of" Third-Party Plaintiffs Clark, Lovell, and Thigpen. (*Id*.) Third-Party Plaintiffs further allege that in December of 2010, they "entered into a lease-purchase agreement with . . . Hutson," under which Third-Party Plaintiffs "agreed to sell certain property to Hutson," including the land on which the Big Water Resort campground was located. (*Id*. ¶ 135.) Third-Party Plaintiffs allege that Hutson "defaulted on both the promissory note and the lease-purchase agreement." (*Id*. ¶ 136.)

Third-Party Plaintiffs allege that in December of 2011, they instituted an action against Hutson in state court "for breach of the lease-purchase agreement, seeking damages and ejectment." (*Id*. ¶ 137.) Third-Party Plaintiffs further allege as follows:

> In March 2012, the parties to the lease–purchase agreement entered into a Settlement Agreement. The terms of the Settlement Agreement imposed many duties on Third-Party Defendant Hutson, including the duty to make certain improvements to the campground property and the duty to make certain payments to Third-Party Plaintiff TLC Holdings, LLC. The Settlement Agreement was approved by a consent order in April 2012.

(*Id*. ¶ 138.) Third-Party Plaintiffs allege that Hutson defaulted under the March 2012 Settlement Agreement and was notified of such default in February of 2013 but did not cure the defaults. (*Id*. ¶¶ 139-40.) Third-Party Plaintiffs assert that they filed an affidavit of default in December of 2013, and in response, Hutson filed a "motion to set aside the affidavit of default and a motion for a temporary restraining order." (*Id*. ¶ 141.) Third-Party Plaintiffs further allege, *inter alia*,

144. In an Order dated March 20, 2013, Judge James declined to set aside the affidavit of default or issue a preliminary injunction and ruled that the March 2012 Settlement Agreement and April 2012 Consent Order should be enforced. Specifically, he ordered that the lease–purchase agreement was terminated and that Third-Party Defendant Hutson was required to vacate the property.

145. Third-Party Defendant Hutson vacated the property in April 2014, at which time Third-Party Plaintiffs Clark, Lovell, and Thigpen were able to resume control and operation of the Big Water Resort campground.

(*Id*. ¶¶ 144-45.)

Third-Party Plaintiffs allege a cause of action for equitable indemnity against Hutson. (*Id*. ¶¶ 146-150.) Third-Party Plaintiffs allege that Hutson has "exposed Third-Party Plaintiffs to potential liability" by "his alleged wrongful acts" and that they "have incurred, and may continue to incur, expenses necessary to protect their interest in defending the claims brought by the members of the Big Water Resort campground." (*Id*. ¶¶ 147, 150.) Third-Party Plaintiffs allege that Hutson "is solely responsible for the acts that have allegedly harmed the members that compose the class in the underlying action" and that they "have no fault and did not join in Third-Party Defendant Hutson's allegedly wrongful acts." (*Id*. ¶ 149.) According to Third-Party Plaintiffs, the relationship between them and Hutson "is such that an obligation in equity exists on Third-Party Defendant Hutson to indemnify Third-Party Plaintiffs." (*Id*. ¶ 148.)

Hutson answered the third-party complaint and filed a counterclaim against Third-Party Plaintiffs. (*See* Dkt. No. 75.) Hutson alleges that in December of 2010, he "became aware of the Big Water Resort through a conversation with a realtor . . . , who stated that the resort was for sale as a campground and for other uses." (Dkt. No. 75 ¶ 51.) Hutson alleges that after various discussions with the realtor and Third-Party Plaintiffs, he met with Clark and Lovell in Chattanooga. (*Id*. ¶¶ 52-

4

54.) According to Hutson, Clark and Lovell told Hutson, *inter alia*, that if Hutson purchased three tracts of land, he "would also be required to purchase the rights to approximately 700 existing club memberships." (*Id*. ¶ 54.) Hutson alleges that when he asked Clark and Lovell how much profit or loss the campground was experiencing, "[t]heir response was that it was not making a profit yet but had much potential." (*Id*. ¶ 55.) Hutson further alleges,

> At or about the end of December, 2010 the Third-Party Defendant agreed to purchase the rights to the club memberships and the option to purchase all the tracts of real property and Third-Party Defendant moved onto the property. Prior to these transactions Third-Party Defendant told the Third-Party Plaintiffs that he intended to develop the property for sale to the public and the Third-Party Plaintiffs understood this and never indicated to Third-Party Defendant that he would be prohibited from doing so by virtue of any of the terms of the club membership agreements or otherwise.

(*Id*. ¶ 56.)

Hutson alleges that when he moved onto the property, he discovered there was only approximately $5,000 in the club's checking account, and that over the next few weeks, he determined "that there was not likely enough income to properly operate and maintain the campground." (*Id*. ¶ 57.) Hutson asserts he "had no choice but to dismiss" most of the campground's employees and cut back on various other expenses "because of lack of money and income from the campground resort operation." (*Id*. ¶ 58.) Approximately two months after moving onto the property "and discovering the . . . situation," Hutson "realized at that time that the resort was a seasonal business," something Third-Party Plaintiffs "never disclosed" to Hutson. (*Id*. ¶ 61.) Hutson alleges he told Clark that "there was no business from the club members and that the resort was essentially dead." (*Id*. ¶ 61.) Hutson states that Clark suggested raising club members' fees, which Hutson did.

(*Id*. ¶¶ 62-66.) Hutson further alleges that Clark told Hutson that Third-Party Plaintiffs "did not want to be responsible for the obligations to the class members, and that perhaps if [Hutson] raised the membership fees drastically then members would be encouraged to drop their memberships." (*Id*. ¶ 64.) Hutson alleges that Clark also told him "that if the members dropped their memberships it would provide an opportunity for [Hutson] to seek business from the general public as opposed to only the club members and that it would lessen the potential of a class-action lawsuit against TLC Holdings, LLC and its owners." (*Id*. ¶ 65.) According to Hutson, when he raised fees, "members began to drop their memberships and threatened to file a class-action lawsuit, stating that they thought they had been scammed and that their memberships had become worthless." (*Id*. ¶ 66.)

Hutson alleges that prior to his involvement in the Big Water Resort, Third-Party Plaintiffs "were allowing members of the public to rent campsites, despite [the fact] that the club membership agreements arguably created a private club resort exclusive to the club's members." (*Id*. ¶ 70.) Hutson further alleges, *inter alia*,

71. Eventually, by the end of 2013, Third-Party Defendant realized that TLC Holdings, LLC and its owners intended to use him as a scapegoat. Once the Third-Party Plaintiffs collected millions of dollars from the lifetime club members the Third-Party Plaintiffs immediately began to quietly market the property for sale through realtor Susan Stroman. Susan Stroman has subsequently told Third-Party Defendant that she was instructed by the Third-Party Plaintiffs not to list the property for sale, but to instead . . . quietly and privately help them find a buyer.

72. Unbeknownst to Third-Party Defendant, the Third-Party Plaintiffs placed him in an impossible situation which prevented him from successfully purchasing the land and developing a subdivision in the middle of the campsites, despite that Third-Party Plaintiffs were fully aware, prior to entering into the . . . transactions with Third-Party Defendant, that this was Third-Party Defendant's plan and reason for entering into the transactions with Third-Party Plaintiffs.

73. Third-Party Plaintiffs intentionally misled and failed to disclose vital information to Third-Party Defendant, including but not limited to the facts that Third-Party Plaintiffs had previously promised the benefits of club membership including the exclusive right to enjoy the club land and property to club members for two lifetimes into the future, that Big Water Resort was losing approximately $250,000 per year and had insufficient reserves or income for proper maintenance of the resort club, that the local authorities had imposed a sewer moratorium on the subject tracts of land, and that the Big Water Resort was subject to exorbitant charges by the Black River Electric utility company.

74. Third-Party Plaintiffs acknowledged to Third-Party Defendant, after they had entered into the transactions with Third-Party Defendant for the purchase of the rights to the club memberships and the lease-purchase agreement for the land, and after entering into the . . . settlement agreement with Third-Party Defendant, that Third-Party Plaintiffs' real reason for entering into these transactions with Third-Party Defendant was [to] distance themselves from the club members and avoid a potential class-action lawsuit against Third-Party Plaintiffs.

(Dkt. No. 75 at ¶¶ 71-74.)

Hutson alleges that "[b]ecause of the wrongful acts and omissions" of Third-Party Plaintiffs, he "became financially destitute and was forced to file for Chapter 11 bankruptcy." (*Id*. ¶ 76.) Hutson asserts he "became in a state of duress and suffered mental anguish because of this situation." (*Id*.) Hutson alleges that Third-Party Plaintiffs "have falsely told third-parties, verbally and in writing, that the failure of Third-Party Defendant's ability to successfully operate and maintain the Big Water Resort was Third-Party Defendant's fault, defaming him and damaging his reputation." (*Id*. ¶ 77.) Hutson contends that Third-Party Plaintiffs "were fully aware that Big Water Resort, LLC was totally insolvent and financially vulnerable prior to contracting" with him. (*Id*. ¶ 78.) Hutson lists the following causes of action against Third-Party Plaintiffs: breach of contract; breach of contract accompanied by fraud; fraud and fraud in the inducement;  negligent

misrepresentation; constructive fraud; breach of the covenant of good faith and fair dealing; negligence, recklessness, wilfulness and wantonness; and defamation. (Dkt. No. 75 at 15-18 of 19.)

### DISCUSSION

As noted above, three motions are pending before the Court: (a) Third-Party Plaintiffs' Motion for Sanctions (Dkt. No. 179); (b) Third-Party Plaintiffs' Motion for Summary Judgment (Dkt. No. 183); and (c) Third-Party Defendant's Motion for Summary Judgment (Dkt. No. 228). The undersigned addresses the motions in turn.

### A.    Motion for Sanctions (Dkt. No. 179)

In the Motion for Sanctions, Third-Party Plaintiffs seek sanctions against Hutson. (*See generally* Dkt. No. 179-1.) Third-Party Plaintiffs state, *inter alia*,

> Throughout the course of this litigation, Third-Party Defendant Hutson has engaged in a pattern of behavior designed to harass and unduly burden Third-Party Plaintiffs and which has made a mockery of the judicial system. He has also attempted to extort a settlement from Third-Party Plaintiffs on numerous occasions by threatening them with criminal prosecution. This behavior has manifested itself primarily through Third-Party Defendant's filings with this Court and his communications with counsel for Third-Party Plaintiffs.

(Dkt. No. 179-1 at 2 of 15.) Third-Party Plaintiffs list a litany of actions taken by Hutson that they contend warrant sanctions. (*See* Dkt. No. 179-1 at 3-15 of 15; *see also* Dkt. No. 179-2; Dkt. No. 179-3; Dkt. No. 179-5; Dkt. No. 179-6; Dkt. No. 179-7; Dkt. No. 179-8; Dkt. No. 179-9; Dkt. No. 179-10; Dkt. No. 179-11; Dkt. No. 179-12; Dkt. No. 179-13; Dkt. No. 179-14; Dkt. No. 179-15; Dkt. No. 179-16; Dkt. No. 179-17; Dkt. No. 179-18; Dkt. No. 179-19; Dkt. No. 179-20; Dkt. No. 179-21; Dkt. No. 179-23; Dkt. No. 179-27; Dkt. No. 179-28; Dkt. No. 179-29; Dkt. No. 179-30.)

Rule 11(b) of the Federal Rules of Civil Procedure provides as follows:

**(b) Representations to the Court.** By presenting to the court a pleading, written motion, or other paper--whether by signing, filing, submitting, or later advocating it--an attorney or unrepresented party certifies that to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances:

> **(1)** it is not being presented for any improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation;
> **(2)** the claims, defenses, and other legal contentions are warranted by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law or for establishing new law;
> **(3)** the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and
> **(4)** the denials of factual contentions are warranted on the evidence or, if specifically so identified, are reasonably based on belief or a lack of information.

FED. R. CIV. P. 11(b).

Third-Party Plaintiffs present evidence of the following in support of their motion for sanctions:

- In an email dated March 25, 2015 to Attorneys Byrd and Wilkerson, Hutson stated that it was his "civic duty to report and provide evidence to the claims department" of Auto Owners Insurance, letting the insurance company know "that TLC's members are up to more no good." (Dkt. No. 179-2.) Hutson asserted TLC is "[t]rying to defraud more victims." (*Id.*) He "[r]espectfully" inquired, "How can someone file an insurance claim for something they plotted and planned and finally got caught?" (*Id.*)

- Hutson has frequently filed motions in this case with "no supporting exhibits" and no "supporting factual information or legal authority." (*See* Dkt. No. 179-1 at 2.) Third-Party Plaintiffs point to his May 5, 2015 motion asking the court to "set aside" his deposition in his bankruptcy case. (*See* Dkt. No. 112.)

- On June 29, 2015, Hutson filed a Motion "to be Allowed to Use Tape Recordings Found During Jury Trial." (Dkt. No. 138.)[2] Third-Party Plaintiffs assert this motion was "an attempt . . . to circumvent this Court's Order compelling him to respond to Third-Party Plaintiffs' first set of requests for production by May 24, which he did not comply with." (Dkt. No. 179-1 at 4.) During his 2014 deposition, Hutson stated that he had not recorded anybody in the room (which included Clark); in this motion, however, he asserts he was able to find a 2011 recording he made of Clark. (*See* Dkt. No. 138; Dkt. No. 179-5 at 10, 13 of 14.)

- On July 5, 2015, Hutson sent an email to Mr. Wilkerson stating that if they were not able to settle, Hutson "plan[s] to quickly move in some new directions to get justice and restitution regarding [his] case that will soon go in another direction plus the civil with [sic] also remain." (Dkt. No. 179-6.) Third-Party Plaintiffs assert this is a "thinly-veiled threat at instituting criminal prosecution of Third-Party Plaintiffs." (Dkt. No. 179-1 at 5.)

- On July 11, 2015, Hutson emailed a copy of a draft complaint against Turner Padget Graham & Laney to Attorneys Byrd, Wilkerson, and Cromer. (Dkt. No. 179-7; Dkt. No. 179-8.) The email itself was blank other than the subject line of "Revised Federal Complaint final draft." (Dkt. No. 179-7.) In the draft complaint, Hutson complained about his treatment when deposed by Attorney Byrd at Turner Padget's office. (Dkt. No. 179-8.) Hutson also accused Turner Padget of, *inter alia*, "unprofessional behavior" and violating the "SC Bar Association's Code of Conduct." (Dkt. No. 179-8 at 2 of 2.)

- One day later, on July 12, 2015, Hutson emailed Attorneys Byrd, Wilkerson, and Cromer with an updated draft of the complaint against Turner Padget. (Dkt. No. 179-9; Dkt. No. 10.) In the email, Hutson told Wilkerson that the draft complaint "will be filed this coming Wed. and also an additional motion request[ing] that your law firm be barred from representing the Class Action/TLC Holdings/Third Party Defendant MB Hutson based on multiple conflicts of interest." (Dkt. No. 179-9.) Hutson also told Wilkerson that he "believe[s] that [Wilkerson's] clients will soon need criminal attorneys." (*Id*.) In the updated draft, Hutson continued to accuse Turner Padget attorneys of "ethics and civil rights violations." (Dkt. No. 179-10 at 3 of 4.) The draft complaint had a "cc" line to the "State Bar Association of South Carolina," though it is unclear whether the draft complaint was in fact forwarded to the Bar. (*Id*. at 4 of 4.)

- One day later, on July 13, 2015, Hutson emailed Wilkerson and told Wilkerson that he was prepared to pay the filing fee and file the complaint against Turner Padget. (Dkt. No. 179-

---

[2]This motion was denied via text order on July 2, 2015. (Dkt. No. 145.)

11.) Hutson stated, *inter alia*, "I have prepared the necessary paper work for the South Carolina State Bar and will attach all necessary exhibits and other documents including depositions regarding your firm's involvement. . . . I honestly can't see how the State Bar Association will allow or support your firm being involved under these clear circumstances." (Dkt. No. 179-11.)

• On July 29, 2015, Hutson emailed Wilkerson, Byrd, and Cromer; the subject line was "Motion to consider criminal first." (Dkt. No. 179-14.) Hutson attached a draft motion entitled "Motion Asking the Honorable Court to Prioritize the Issue of Criminal Felony Theft Over the Civil Issues Involving Certification." (Dkt. No. 179-15.) It does not appear this motion was ever filed with the court.

• On or about July 29, 2015, Hutson filed a motion entitled "Third-Party Defendant's Motion Citing Reasons for the Piercing of Any Veil that Owners of TLC Holdings, LLC Do and Could Hide Behind, and a Formal Plea for the Immediate Investigation of Criminal Wrongdoings by TLC Holdings, LLC., et al. to Be Made by This Honorable Court to the Appropriate Investigative Departments of the United States." (Dkt. No. 160.)[3] This motion was withdrawn on or about December 3, 2015. (Dkt. No. 213.)

• On July 30, 2015, Hutson emailed Byrd, Wilkerson, Cromer, Padget, Thomas, and Perry. (Dkt. No. 179-18.) The email was blank other than the subject line, which stated "Wayne Byrd Conspiracy." (*Id.*) A draft motion was attached; that draft motion was entitled, "Third-Party Defendant's Motion Regarding Third Parties Defense Attorney Wayne Byrd Showing a Conspiring Rol[e] to Protect Their Clients Felony Theft By Deception." (Dkt. No. 179-19.) Hutson filed this motion on or about August 3, 2015, and withdrew it on or about December 3, 2015. (Dkt. No. 162; Dkt. No. 213.)

• On or about July 31, 2015, Hutson filed a document entitled "Third-Party Defendant Shows To Honorable Court How TLC Committed Felony Theft by Deception According to Federal Law." (Dkt. No. 161.) In that filing, Hutson "prays" that the Court "immediately turn this entire scheme into a First Class WHITE COLLAR FELONY CRIME case, having all three TLC owners arrested and charged with FELONY THEFT BY DECEPTION and prosecuted . . . ." (Dkt. No. 161 at 2 of 2.)

---

[3]To the extent Hutson attempts to have criminal charges brought against Thigpen, Lovell, and/or Clark, he cannot do so in the instant civil action. *See Sattler v. Johnson*, 857 F.2d 224, 227 (4th Cir. 1988) (rejecting argument that the plaintiff "had an enforceable right as a member of the public at large and as a victim to have the defendants criminally prosecuted," stating, "There is . . . no such constitutional right . . . .").

- On July 31, 2015, Hutson emailed Byrd, Wilkerson, Cromer, Padget, Thomas, and Perry. (Dkt. No. 179-20.) The email is blank other than the subject line, which states, "WAYNE Byrd." (*Id.*) The document he attached to that email was entitled "The Supreme Court of South Carolina Office of Disciplinary Counsel Has Opened Investigation into TLC Holdings, LLC's Defense Team & CEO, Wayne Byrd Regarding this Case, Thus Third Party Defendant Asks that the Turner Padget Defense Team for TLC Holdings, LLC Be Barred Based on Various, Potentially Serious, Conflicts." (Dkt. No. 179-21.) Hutson filed that document on or about August 7, 2015. (Dkt. No. 168.) Hutson asserted therein that Byrd is "in such blatant disregard of ethical and professional behavior that he is now under investigation by the Supreme Court of South Carolina's Disciplinary Counsel pertaining to this case." (Dkt. No. 168.)

- In an email dated August 4, 2015 to Byrd, Wilkerson, Padget, Thomas, Harper, and Perry, Hutson stated that he planned to file suit in the South Carolina Court of Common Pleas "regarding case number 11cp-14602," asking that the "case number and rulings be dropped, reversed or over-turned on the grounds of fraud, theft, deception, and entrapment." (Dkt. No. 179-23.)

- On September 1, 2015, Hutson emailed Byrd, Wilkerson, Cromer, Thomas, and Padget; the email was blank except for the subject line of "Ammended [sic] filing 9/1/15." (Dkt. No. 179-27.) Hutson attached a draft motion to his email; the draft motion was entitled "Motion Citing Felony Theft by Deception Committed by TLC Holdings, LLC Owners." (Dkt. No. 179-28.) Hutson therein asserted that the Third-Party Plaintiffs violated South Carolina Code Section 16-13-260. (Dkt. No. 179-28.) Hutson filed this motion on or about September 9, 2015 and withdrew it on December 3, 2015. (Dkt. No. 186; Dkt. No. 213.)

- On September 2, 2015, Hutson emailed Byrd, Wilkerson, Cromer, Padget, and Thomas. (Dkt. No. 179-29.) The email was blank except for the subject line, which stated "ORIGINAL Federal Header TLC." (Dkt. No. 179-29.) Hutson attached a draft motion entitled "Third-Party Defendant's Motion Outlining Reasons for All Pending Motions to Be Heard in Court Before the Honorable Judge Baker." (Dkt. No. 179-30.) Although Hutson did not name this individual by name, presumably he was describing Byrd when Hutson said, "Third Party Plaintiff's Counsel (CEO) is shrewd, conniving, involved, [and] entwined with his clients in fraudulent and dishonest actions . . . ." (Dkt. No. 179-30.) Hutson filed this document on September 9, 2015. (Dkt. No. 185.)

The instant Motion for Sanctions was filed on September 3, 2015. (*See* Dkt. No. 179.) As noted above, Rule 11 "specifies that attorneys and *pro se* plaintiffs must sign pleadings, motions or other papers filed with the court" and that such a signature "constitutes a certification that (1) the paper is not being presented for any 'improper purpose,' (2) legal contentions therein are 'warranted,' (3) allegations have evidentiary support, and (4) denials of allegations are warranted on the evidence." *Johnson v. Lyddane*, 368 F. Supp. 2d 529, 532 (E.D. Va. 2005). "The purpose of Rule 11 is to deter conduct that frustrates the just, speedy, and inexpensive determination of civil actions." *Laremont-Lopez v. Se. Tidewater Opportunity Ctr.*, 968 F. Supp. 1075, 1078 (E.D. Va. 1997). Although *pro se* pleadings are held to less stringent standards than formal pleadings drafted by lawyers, *see Haines v. Kerner*, 404 U.S. 519 (1972), Rule 11 sanctions can still be appropriate against an individual despite his or her *pro se* status. *See Harmon v. O'Keefe*, 149 F.R.D. 114, 116 (E.D. Va. 1993).

In the case *sub judice*, Hutson has accused Turner Padget's attorneys of a variety of nefarious actions, though it does appear Hutson ultimately withdrew the motions accusing Turner Padget of criminal activities. (*See* Dkt. No. 209; Dkt. No. 213.) Despite being previously told that motions pertaining to trial (such as to exclude evidence) are premature, Hutson continued to file such motions. (*See, e.g.* Dkt. No. 145; Dkt. No. 260.) In addition, he re-filed the motion pertaining to his deposition that Judge Marchant previously denied. (*See* Dkt. No. 255; *see also* Dkt. No. 121.)

Given Hutson's *pro se* status, the fact that he withdrew many objectionable filings prior to Third-Party Plaintiffs' filing the Motion for Sanctions, the fact that Hutson had not been previously warned that he was in violation of Rule 11, and the fact that Hutson will no longer be proceeding

*pro se* if the District Judge adopts the undersigned's recommendation as to Third-Party Plaintiffs'

Motion for Summary Judgment (Dkt. No. 183),[4] the undersigned recommends denying Third-Party

Plaintiffs' Motion for Sanctions (Dkt. No. 179). *See Pizzuto v. Smith*, Civ. A. No. 5:12-CV-149,

2014 WL 1648269, at *15 (N.D. W. Va. Apr. 23, 2014), adopted at 2014 WL 2155039 (N.D.W. Va.

May 22, 2014) ("Courts that have imposed sanctions against *pro se* parties frequently attach

importance to the fact that the party had already been placed on notice that she was close to violating

Rule 11."); *see also Sharp v. Town of Kitty Hawk, N.C.*, Civ. A. No. 2:11-cv-13-BR, 2011 WL

5520432, at *2 (E.D.N.C. Nov. 14, 2011) ("While plaintiff's complaint in this action was largely

factually and legally duplicative of the one she filed in her earlier action here, such repetition does

not rise to a level violative of 'an objective standard of reasonableness' worthy of Rule 11 sanctions.

Nor is it indicative of the bad faith and vexatious behavior necessary to invoke the court's inherent

power to sanction.").

### B.    Motion for Summary Judgment (Dkt. No. 183)

Third-Party Plaintiffs seek summary judgment as to all of Hutson's counterclaims against

them. Third-Party Plaintiffs contend they are entitled to summary judgment "on Hutson's

Counterclaims because the Counterclaims are barred by the doctrine of *res judicata*." (Dkt. No. 183-

1 at 7.) Specifically, Third-Party Plaintiffs assert Hutson's claims against them "are barred by *res

judicata* due to the Settlement Agreement which was incorporated into Judge James' 2012 Consent

Order." (Dkt. No. 183-1 at 9.) As explained below, many of the claims Hutson raises in the case *sub*

---

[4]Hutson has counsel as to the claim against him for equitable indemnity. (*See* Dkt. No. 253.) Counsel does not
represent Hutson as to Hutson's counterclaims against Third-Party Plaintiffs. (*Id.*)

*judice* are the identical claims he raised in the state court case of *TLC Holdings, LLC v. M.B. Hudson a/k/a M.B. Hutson*, Civ. A. No. 2011-CP-14-602 (hereinafter the "State Court Case"); the parties to that action settled it and entered into a release. For the reasons set forth below, the undersigned recommends concluding Hutson's claims for breach of contract; breach of contract accompanied by fraud; fraud and fraud in the inducement;  negligent misrepresentation; constructive fraud; breach of the covenant of good faith and fair dealing; and negligence, recklessness, wilfulness and wantonness are barred by the release he executed in settling the state court action. The undersigned further recommends concluding that Hutson's claim for defamation fails as a matter of law. Accordingly, Third-Party Plaintiffs' Motion for Summary Judgment (Dkt. No. 183) should be granted.

Before turning to the legal analysis, the undersigned will review the allegations, the settlement, and the Orders issued in the State Court Case.

**1.**      **The Allegations in the State Court Case (2011-CP-14-602)**

The case *sub judice* is not the first civil action between the parties; TLC filed suit against Hutson in the State Court Case. The 2012 Consent Order to which Third-Party Plaintiffs refer was issued in the State Court Case. Most of the allegations Hutson makes against Third-Party Plaintiffs in the case *sub judice* are the same allegations he made against them in the State Court Case.

In the State Court Case, Hutson filed a counterclaim against TLC Holdings, LLC and a Third-Party Complaint against Clark, Lovell, and Thigpen. (*See* Dkt. No. 183-5.) Hutson raised the Third-Party Plaintiffs' knowledge (and failure to disclose)–and Hutson's lack of knowledge– that the South Carolina Public Health and Environmental Control "had imposed a moratorium on the

property that prevented the property from tying into public water and sewer services." (Dkt. No. 183-5 at ¶¶ 42-44; ¶ 58.) Hutson also raised therein Third-Party Plaintiffs' knowledge that Hutson intended to develop condominiums and other residential structures and failure to disclose that "there was no sewer capacity at that time." (*Id*. ¶¶ 47-48.) He also alleged as follows:

> 49. Pursuant to the contract, Hutson caused a title examination to be made of the premises and found that [TLC Holdings, LLC] was involved in litigation affecting the premises. The Sellers in the contract disclosed the existence of that litigation, but set forth a Covenant, Consent and Agreement that included language that said "Seller covenants, consents and agrees that these actions shall be dismissed or otherwise addressed on or before closing of the entire premises, so that said pending legal action shall in no way encumber the property or hinder such closing." To date, those actions are still pending and Hutson has been unable to proceed to purchase the property.

(*Id*. ¶ 49.) He also alleged that Third-Party Plaintiffs interfered with his development of the property; specifically, Hutson alleges therein that Third-Party Plaintiffs notified Clarendon County Council of the pending litigation in order to "delay and hinder . . . [Hutson] from further performance pursuant to the Lease Purchase Agreement." (*Id*. ¶ 85.) He also alleged that Third-Party Plaintiffs "deliberately and maliciously t[ook] steps to try to cause [him] to fail at this project in order for them to recover same with the value of the project enhanced through [his] efforts." (*Id*. ¶ 89.) Hutson further asserted therein that he should be given an equitable interest in the property for his improvements. (*See id*. ¶¶ 55-56.)

## 2.    The Orders in the State Court Case

The Settlement Agreement to which Third-Party Plaintiffs point was signed by Hutson on March 30, 2012. (*See* Dkt. No. 183-6 at 10 of 10.) The Settlement Agreement purports to be between

Hutson and TLC Holdings, LLC. (*See* Dkt. No. 183-6 at 1 of 10.) However, it also provides as follows:

> 2. This Settlement Agreement shall be incorporated into a Consent Order (the "Consent Order") entered in the above-referenced case (the "Litigation"). Although Richard U. Clark, Jimmy S. Lovell and James C. Thigpen are parties to this Settlement Agreement by virtue of being parties to the [Lease Purchase] Agreement, and are named as Third Party Defendants in the Litigation, they have not been served with the pleadings in the Litigation and shall not be deemed to have appeared in the Litigation by their execution of this Settlement Agreement. This Settlement Agreement shall be binding upon all of the undersigned parties even though Richard U. Clark, Jimmy S. Lovell and James C. Thigpen have not appeared in the Litigation and are not parties to the Consent Order.

(Dkt. No. 183-6 at 1-2 of 10.) The Settlement Agreement further provides, *inter alia*,

> 4. Pursuant to the Consent Order, in the event that Mr. Hutson fails to comply with the terms of the Settlement Agreement, unless such failure is a direct and proximate result of TLC's failure to perform an action expressly required of it in this Settlement Agreement, time being of the essence, then the Plaintiff is entitled to the following immediate relief, without further notice of the court or notice to Defendant or his attorney: (a) termination of the [Lease Purchase] Agreement, (b) cancelation [sic] of the lis pendens filed by Hudson in this action, (c) immediate vacation of the Property by Mr. Hudson except for his personal residence, which shall be vacated within 15 days, enforceable by the Charendon County Sheriff; and (d) the provisions of Section 23 shall be effective. Prior to any such default by Hudson hereunder, the parties acknowledge that the Lease remains in full force and effect in accordance with its terms, as modified by this Settlement Agreement, and during the Primary Term (as may be extended as provided herein), Hutson shall have full possession of the Property in accordance with, and subject to, the terms of the Lease as modified by this Settlement Agreement.

(Dkt. No. 183-6 at 2 of 10.)

> Section 23, the "Release," provides as follows:

> 23. As a material consideration of this Settlement Agreement, in the event of the termination of the [Lease Purchase] Agreement pursuant to Section 4 above as a

17

result of Hudson['s] breach hereof, then automatically and without further action of the parties, as of the date of such termination (the "Termination Date"), Hudson shall be deemed to have released, forever discharged and promised never to sue TLC, Richard U. Clark, Jimmy S. Lovell, and James C. Thigpen, and their respective agents, attorneys, insurance companies, parent companies, subsidiaries, affiliates, predecessors, successors, or assigns (together, the "TLC Parties"), from any and all injuries, personal or property, known or unknown, causes of action, demands, warranty claims, damages, suits at law or in equity, of whatsoever kind and nature, or because of any matter or thing done, omitted or suffered to be done, by the TLC Parties, prior to and including the Termination Date, on account of all injuries and damages, including attorneys' fees and litigation expenses, arising from the Lease or the relationship between Hudson, on the one hand, and TLC, Richard U. Clark, Jimmy S. Lovell, and James C. Thigpen, on the other hand, and any causes of action, known or unknown, relating to the Lease, including any and all claims alleged, or which could have been alleged, in the Litigation.

(Dkt. No. 183-6 at 6-7 of 10.)

On April 12, 2012, Judge James issued a Consent Order that approved the Settlement Agreement and incorporated the Settlement Agreement into the Consent Order by reference. (*See generally* Dkt. No. 183-7; *see also* Dkt. No. 183-7 at 2 of 7.) In an Order dated March 20, 2014, Judge James addressed various motions in the State Court Case, including Hutson's Motion to Set Aside Affidavit of Default and Motion for Temporary Restraining Order. (*See generally* Dkt. No. 183-8; *see also* Dkt. No. 183-8 at 3 of 12.) Judge James found that Hutson had breached several provisions of the Settlement Agreement, including, *inter alia*, failing to pay the arrearage prior to December 31, 2012. (Dkt. No. 183-8 at 6 of 12.) Judge James' Order further stated,

10. Pursuant to the express terms of the Consent Order, effective upon the filing of the Affidavit of Default in this action on December 11, 2013, Plaintiff was entitled to have the following immediate relief, without further order of the Court or notice to Defendant or his counsel of record: (a) termination of the Lease Purchase Agreement, (b) cancellation of the Lis Pendens [filed by Defendant in this case], (c) immediate vacation of the Property by Defendant except for his personal residence

thereon, which shall be vacated within fifteen (15) days; and (d) the provisions of Section 23 shall be effective." Consent Order at ¶ 2.

11. Therefore, the Lease Purchase Agreement was terminated, according to its terms as modified by the Settlement Agreement and Consent Order, as of December 11, 2013 (the "Termination Date"), and Hutson was required to vacate the Property immediately, except only for his personal residence thereon, which he was required to vacate within fifteen (15) days (i.e., December 26, 2013).

(Dkt. No. 183-8 at 11 of 12.) That order further provides,

[I]t is hereby:

. . .

FURTHER ORDERED, that the Settlement Agreement and Consent Order are to be enforced according to their terms.

FURTHER ORDERED, that, in conjunction with enforcing the Consent Order according to its terms, pursuant to Paragraph 2 of the Consent Order, upon the filing of the Affidavit of Default on December 11, 2013, Plaintiff was and is entitled to, and is hereby awarded, the following immediate relief, without the need for further Order of this Court:

(a) The Lease Purchase Agreement was deemed automatically terminated and of no further force or effect; [and]

(b) The lis pendens filed by Defendant against the Property was deemed automatically cancelled, terminated of record, and of no further force or effect . . . .

. . .

FURTHER ORDERED, that pursuant to the Consent Order, Defendant is deemed to have granted the TLC Release to the TLC parties, as set forth more fully in Section 23 of the Settlement Agreement.

(Dkt. No. 183-8 at 11-12 of 12.)

**3.**     **Release**

Hutson's claims for breach of contract; breach of contract accompanied by fraud; fraud and fraud in the inducement;  negligent misrepresentation; constructive fraud; breach of the covenant of good faith and fair dealing; and negligence, recklessness, wilfulness and wantonness are barred by the release he entered in settling the State Court Case. As in *Bowers v. Department of Transportation*, 360 S.C. 149, 600 S.E.2d 543 (Ct. App. 2004), the Settlement Agreement in the case *sub judice* is a contract. *Bowers*, 360 S.C. at 153, 600 S.E.2d at 545; *see also Hyman v. Ford Motor Co.*, 142 F. Supp. 2d 735 (D.S.C. 2001). In *Bowers*, the South Carolina Court of Appeals upheld dismissal of two suits against the Department of Transportation, concluding that the releases executed by two drivers in an accident released the Department of Transportation. The court noted that the release was a contract and that since the release "unambiguously sets forth the contracting parties' intent, [the court is] bound by that clearly expressed intent without resort to extrinsic evidence." *Bowers*, 360 S.C. at 153, 600 S.E.2d at 545. The court further stated,

> The terms of the Release do not evince an intent to limit its scope to any specifically identified parties. Rather, the Release is general and all encompassing in its scope. It clearly states that the Appellants released the tort-feasor "and all other persons, firms or corporations liable, or who might be claimed to be liable." This language is a clear, explicit, and unequivocal indication of the parties' intent that *all* claims arising from the accident-now and in the future-are barred under the terms of the Release. Had Appellants intended a contrary result and desired to limit the operation of the Release to named persons only, the terms of the Release could have been easily tailored to that end. We are constrained by the plain, unambiguous language of the Release to find that Appellants' claims against SCDOT fall within the terms of the Release.

*Id.* at 154, 600 S.E.2d at 545-46.

Turning to the case *sub judice*, the Release–paragraph 23 of the Settlement Agreement–unequivocally provides that if the Lease Purchase Agreement is terminated as a result of Hutson's breach, Hutson "shall be deemed to have released, forever discharged and promised never to sue" Third-Party Plaintiffs for "any and all injuries, personal or property, known or unknown, causes of action, demands, warranty claims, damages, suits at law or in equity, of whatsoever kind and nature, or because of any matter or thing done, omitted or suffered to be done" by Third-Party Plaintiffs, "prior to and including" December 11, 2013. (Dkt. No. 183-6 at 6-7 of 10; *see also* Dkt. No. 183-8 at 11 of 12.) This Release is cut and dry–Hutson has clearly released Third-Party Plaintiffs from liability for actions they took (or actions they failed to take) prior to December 11, 2013.

A contract can be set aside for fraud, *see First Equity Inv. Corp. v. United Serv. Corp. of Anderson*, 299 S.C. 491, 497, 386 S.E.2d 245, 249 (1989) ("As a general rule, a defrauded party to a contract has a choice of remedies; he may rescind the contract and recover what he has paid, or he may affirm the contract and recover damages."), and Hutson asserts he has been defrauded. However, having reviewed all of Hutson's allegations and assertions, the undersigned concludes–for the reasons set forth below–that this Settlement Agreement and Release ***cannot*** be set aside due to fraud.

In arguing that the Settlement Agreement and Release should be set aside due to fraud, Hutson refers to the January 2009 meeting minutes  as well as the "2015 depositions." (Dkt. No. 192; *see also* Dkt. No. 200-1 at 9-11 of 28.) Hutson asserts the minutes of the January 2009 meeting reveal the "severe options" TLC was "consider[ing] to rid themselves of the BWR campground and

its members." (Dkt. No. 200 at 3 of 7.) Although Hutson refers to "2015 depositions," the only deposition transcript he attached to his filings opposing the Motion for Summary Judgment were transcripts from Lovell's deposition taken on February 16, 2011. (*See* Dkt. No. 200-1 at 15-16, 21 of 28.)

In his Supplemental Response in Opposition, Hutson contends that TLC knew–as of April 2003–that sewer service was needed to support further development at the Big Water Resort and that such service was not available until the water treatment plant in Manning was enlarged. (Dkt. No. 200 at 1 of 7.) Hutson states, "TLC Holdings, LLC and its owners were fully aware of this serious long term problem as it prevented ANY developer from getting any of the necessary local governmental approvals to develop at that location." (*Id*. at 2 of 7.) According to Hutson, TLC's owners "knew that water and sewer as an essential component for the Buyer signing," and they also knew that "water and sewer WAS NOT AVAILABLE." (Dkt. No. 200 at 4 of 7.)

To support his claim for "FELONY THEFT BY DECEPTION," Hutson asserts that although TLC "was not EVER with clear title to close, they continued to collect hundreds of thousands of dollars from [Hutson] for a 'right to purchase.'" (Dkt. No. 200 at 5 of 7.) He states, "Is it not theft by deception to then add mandatory cash requirements totaling hundreds of thousands of dollars for the 'Right to Purchase'–even if they could be credited toward closing–since the Seller had NO INTENTION to close?" (Dkt. No. 200 at 2 of 7.) Hutson points to TLC's admission that "they had financially subsidized" the Big Water Resort "just to keep the gates open." (Dkt. No. 200 at 2 of 7.)

Hutson asserts that TLC knew–as outlined in its January 2009 minutes–that the membership agreements "creat[ed] un-marketable title for home loans." (Dkt. No. 202 at 1 of 2; *see also* Dkt. No.

22

202-1.)[5] According to Hutson, TLC found several buyers "who wanted to buy and develop the property into a condo subdivision," but these developers "found that TLC Holdings, LLC could not get marketable title." (Dkt. No. 200 at 2-3 of 7.) Hutson notes that Community Resource Bank had a "very large lien on all of the property for approximately two years," and each time Hutson asked Clark "if the title was now clear in order for Third Party Defendant to start making plans to acquire purchase contracts from potential Buyers to move toward closing," "[n]ever once did the Seller or any of its agents inform the Buyer[] that clear title had been resolved." (Dkt. No. 200 at 4 of 7.)

---

[5]Hutson knew about the membership agreements at the time he purchased the Big Water Resort. (*See* Dkt. No. 266-1 at 7 of 35; *see also* Dkt. No. 266-1 at 31-34 of 35.) Renee Roark was Hutson's realtor in connection with the purchase of Big Water Resort. (*See* Dkt. No. 266-1 at 4-7 of 15.) On November 11, 2010, Ms. Roark emailed Mr. Coffey of Coffey Chandler & Kent; that email stated, *inter alia*,

> Attached is Susan's lifetime membership info. regarding Big Water camp ground. My buyer **is concerned about the "life time" memberships and the impact they can have on the future development of the property**. In other words, in your opinion, what is the easiest, legal way to terminate the lifetime memberships of Big Water? Will these memberships have an impact on obtaining clear title for the property?

(Dkt. No. 266-3 (emphasis added).) At the hearing, Mr. Hutson stated, "I knew that there were memberships, but I did not know, and was not ever told that the memberships created defective title." On the one hand, Hutson stated at the hearing that he knew there were memberships but "was told that they were annual," and on the other hand, he stated that he "asked Renee Roark if the . . . lifetime memberships would affect the title." Hutson complained at the hearing that he never received an answer as to whether the lifetime memberships would have an impact on obtaining clear title. He also stated at the hearing that he bought Big Water Resort without looking at the books or business records. Furthermore, the Lease Purchase Agreement contained the following provision:

> Purchaser shall, within ninety (90) days after the Effective Date, investigate Seller's title to the Premises and identify any exceptions to title which are not acceptable to Purchaser (any such exception being referred to herein as a "Title Exception"). Purchaser shall within ninety (90) days after the Effective Date provide Seller notice of any such Title Exception. If Purchaser does not notify Seller in writing of Title Exceptions within ninety (90) days after the Effective Date, then Purchaser shall be deemed to have accepted title to the Premises with all exceptions and conditions. . . .

(Dkt. No. 266-6 at 5 of 34.) The "Effective Date" was in December of 2010. (*See* Dkt. No. 266-3 at 1, 25-27 of 34.) Hutson admitted at the hearing that he had access to the membership agreements within this ninety day period.

Hutson was also represented by an attorney–Andrew Tucker–in conjunction with his purchase of Big Water Resort. (*See* Dkt. No. 266-1 at 9-13 of 35.) At his deposition, Hutson stated that approximately four or five days after Christmas of 2010, he and Tucker "actually started reading some of the membership agreements." (Dkt. No. 266-1 at 15 of 35.) Hutson continued,

> And lo and behold, I can't tell you why, [Tucker] never picked up on the fact that I was obligated, according to you, for 60 years, for each one of these people. Because if so, it would be–why–why bother to get a–a sales contract and charge me \$10–\$10,000 a month, when they know good and well that I can't develop, because I've got to keep this place as a whole for 60 years?

(Dkt. No. 266-1 at 15-16 of 35.) Hutson indicated that he and Tucker "sat at the table together and went over" the membership agreements before closing. (Dkt. No. 266-1 at 16 of 35.)

23

Hutson contends he was required to close within 24 months, but he was "trapped and unable to close" because of the liens on the property. (*Id*.)

Hutson asserts Third-Party Plaintiffs "intentionally held back and misrepresented critical information (ex.: sewer . . . ) and the sixty year obligation to family members for an exclusive right to use all property covered by the contract and improvements thereon." (Dkt. No. 200 at 5 of 7.) Hutson contends he had seven months under the contract to "repave all private roads, parking lots and recreational vehicle (RV) parking spaces on the Premises," but it was impossible to do so within seven months because "the municipalities would not approve any permanent asphalt roads" unless he was able to address the sewer issues. (Dkt. No. 200 at 5 of 7.)

According to Hutson, Third-Party Plaintiffs never had any plan to "actually sell" the property but that instead their "plan was to stage it so they could re-call the property." (Dkt. No. 200 at 6 of 7.) He asserts that Third-Party Plaintiffs knew–"as far back as January 16, 2009"–that they could not sell real estate that was leased for an extended period of time. (Dkt. No. 200 at 6 of 7.) Hutson claims "theft" in that he "was not offered nor given" an "'equitable interest' for accomplishments during [his] tenure on-site, which was appraised at over one million dollars . . . WITHOUT the impact of the restaurant." (Dkt. No. 200 at 6 of 7.)

As to contractual interference, Hutson asserts that attorney Thomas Harper, who was representing TLC, "contractually interfered, on behalf of TLC Holdings, LLC . . . by contacting government approval agencies to slow down [Hutson's] progress in acquiring approvals for the development project," negatively impacting his "ability to close within the contract's 24 months." (Dkt. No. 200 at 6 of 7.)

Hutson asks this Court to "set aside paragraph 23 [of the Settlement Agreement] for it was designed to be a fraudulent buffer providing protection to TLC Holdings, LLC and it's [sic] owners to carry out the criminal acts." (Dkt. No. 192 at 3 of 4.)

Hutson's claims for breach of contract; breach of contract accompanied by fraud; fraud and fraud in the inducement;  negligent misrepresentation; constructive fraud; breach of the covenant of good faith and fair dealing; and negligence, recklessness, wilfulness and wantonness all arise out of the Lease Purchase Agreement and Hutson's dealings with TLC, Thigpen, Lovell, and Clark in purchasing the Big Water Resort. The Release plainly releases all claims against Third-Party Plaintiffs for claims that arose on December 11, 2013 or before. (*See* Dkt. No. 183-8 at 11 of 12.)

Hutson has not alleged fraud that took place after December 11, 2013, and there is accordingly no basis to set aside the Release.[6] Most of the circumstances to which he now points (with the exception of his claim for defamation, discussed below) were raised in his counterclaim

_____

[6]At the hearing, Hutson argued he was "misled" via "six direct fraudulent paths" and submitted a document laying out his arguments. (*See* Hutson Ex. 3.) The alleged misrepresentations which, according to Hutson, constitute fraud, are as follows:

(a) Big Water Resort has no known debt, when the campground was operating with an annual shortfall;

(b) The financial reports listed memberships as a "present net value" of over $1.7 million, when they "were in fact a liability";

(c) "T[]here w[ere] no actions, suits, or proceedings, either at law or equity . . . or to the knowledge of Sellers, threatened," where Third-Party Plaintiffs were aware of the threat of suit by the individuals who purchased membership agreements;

(d) "[The] Seller represents, warrants and covenants to Purchaser" that seller is "[i]n compliance with all laws, regulation and orders applicable to its business," where Third-Party Plaintiffs failed to record the membership agreements pursuant to South Carolina Code § 27-33-30;

(e) Third-Party Plaintiffs had "[g]ood and marketable title" to all "properties and assets," where Big Water Resort "did not own any real estate"; and

(f) Third-Party Plaintiffs had "[g]ood and marketable title" where (1) the sellers "agreed to owner finance the purchase," as it "appeared from their willingness to owner finance that they were confident in the value of the property and the marketability of their title" and where (2) the sellers "agreed to be paid from the proceeds of the sale of condominiums and lots," as the sellers' "willingness to accept a percentage gave confidence that they had good and marketable title to the property."

(Hutson's Ex. 3.) All of these alleged "fraudulent paths" arise out of Hutson's purchase of the Big Water Resort; they do not pertain to the Release.

and third-party claim in the state court action, so he clearly had notice of these circumstances at the time he entered into the Settlement Agreement and Release. All of Hutson's claims pertaining to fraud relate to the ***original*** transaction, ***not the Release***. In other words, Hutson cannot set aside the Release because he has not made any showing that fraud induced him to enter into the Release.  *See House v. Aiken Cnty. Nat'l Bank*, 956 F. Supp. 1284, 1291-92 (D.S.C. 1996) (granting motion to dismiss–treated as motion for summary judgment–without prejudice where "[t]he only issue before this Court is whether the release signed as a result of that previous settlement is invalid because of fraud, misrepresentation or like circumstances. Plaintiffs have failed to provide any evidence, other than their own conclusory allegations, that they were induced to enter into this release because of fraud or misrepresentation."); *see also Hopkins v. Fidelity Ins. Co.*, 240 S.C. 230, 125 S.E.2d 468 (1962).

Moreover, to establish fraud, Hutson would have to prove the following elements:

(1) a representation; (2) its falsity; (3) its materiality; (4) either knowledge of its falsity or reckless disregard of its truth or falsity; (5) intent that the representation be acted upon; (6) the hearer's ignorance of its falsity; (7) the hearer's reliance on its truth; (8) the hearer's right to rely thereon; and (9) the hearer's consequent and proximate injury.

*Armstrong v. Collins*, 366 S.C. 204, 218-19, 621 S.E.2d 368, 375 (Ct. App. 2005) (quoting *Regions Bank v. Schmauch*, 354 S.C. 648, 672, 582 S.E.2d 432, 444-45 (Ct. App. 2003)). Although Hutson frequently contends he was defrauded, he has not clearly alleged the elements of fraud. For example,

it is not clear upon what representation or representations he asserts he relied, nor is it clear such representation was false or that he had the right to rely on such representation(s).[7]

Although Hutson repeatedly asserts fraud, none of his assertions of fraud pertain to the Release. He is therefore is not entitled to set aside the Release. *See House*, 956 F. Supp. at 1291-92; *see also Hopkins*, 240 S.C. 230, 125 S.E.2d 468. Third-Party Plaintiffs are entitled to summary judgment on the following claims Hutson makes against them: breach of contract; breach of contract accompanied by fraud; fraud and fraud in the inducement; negligent misrepresentation; constructive fraud; breach of the covenant of good faith and fair dealing; and negligence, recklessness, wilfulness and wantonness.

### 4.    Defamation

Hutson's claim for defamation requires a slightly different analysis, as the events giving rise to this claim occurred after execution of the Settlement Agreement and Release. At the hearing, Mr. Hutson clarified that the only basis for his defamation claim is the April 3, 2014 letter from TLC to "Members of the Big Water Resort Campground." (*See* Dkt. No. 77-17.) That letter provides, in relevant part,

> Over the course of the past three (3) years, Mr. Hutson breached his obligations under the [Lease Purchase] Agreement in numerous respects. Those breaches began just months after he took over the property. For example, he failed to pay rents he owed to TLC Holdings, LLC, and taxes owing to Clarendon County that were his responsibility under the Agreement. He failed to pave or repave the roads as required by the Agreement, which would have been a benefit to everyone at the campground. At times, he failed to carry insurance that was necessary to

---

[7]For example, Hutson indicates he asked Lovell and Clark–"right before [he] bought" Big Water–how much money the campground was making, and Hutson admits they said none. (*See* Dkt. No. 135 at 28, 83-84 of 328.) He complains, however, that TLC "didn't bother to tell [him] it was losing $300,000 a year." (*Id.*)

protect the property and the club [that] operated on it. TLC Holdings, LLC has been forced to make tax payments and insurance payments to protect the property that were Mr. Hutson's responsibility under the Agreement.

Beginning in 2011, TLC Holdings has endeavored to enforce the obligations of Mr. Hutson with regard to the campground. As a result of Mr. Hutson's breaches, TLC Holdings, LLC sued him in state court back in 2011. Mr. Hutson has vigorously resisted TLC Holdings' efforts to enforce his obligations. After protracted litigation in the state court, when TLC holdings was finally on the verge of success in evicting Mr. Hutson from the property, Mr. Hutson then filed for bankruptcy on January 8th of this year, delaying for a few more months TLC Holdings' recovery of the property. For all these months that Mr. Hutson has resisted TLC Holdings' efforts to recover the property, he has continued the breaches of the Agreement that have hurt TLC Holdings, LLC, and the club members who have used the property.

. . .

As a result of TLC Holdings' successes in the state court and bankruptcy court, TLC Holdings, LLC is now finally in control of the campground property for the first time since December, 2010. Much has changed over those three years, and it appears that much work is needed. . . .

Unfortunately, because the records recovered by TLC Holdings, LLC from Mr. Hutson are incomplete in some respects, we ask that you provide to us your understanding of your current status with regard to your membership agreement with Big Water Resort. . . .

. . .

We understand that this protracted litigation may have confused or frustrated you. It certainly has us. . .

(Dkt. No. 77-17.)

The undersigned recommends granting summary judgment as to Hutson's claim for defamation. "The tort of defamation allows a plaintiff to recover for injury to her reputation as the result of the defendant's communication to others of a false message about the plaintiff."

28

*Holtzscheiter v. Thomson Newspapers, Inc.*, 332 S.C. 502, 508, 506 S.E.2d 497, 501 (1998); *see also*

*Parrish v. Allison*, 376 S.C. 308, 321, 656 S.E.2d 382, 389 (Ct. App. 2007) ("A communication is

defamatory if it tends to harm the reputation of another as to lower him in the estimation of the

community or to deter third persons from associating with him." (citing *Holtzscheiter*, 332 S.C. at

530, 506 S.E.2d at 513 (Toal, J., concurring))). As stated in *Parrish*,

> To recover for defamation, the plaintiff must establish by a preponderance
> of the evidence, that there was (1) a false and defamatory statement by the defendant
> concerning the plaintiff; (2) an unprivileged communication; (3) fault on the
> defendant's part in publishing the statement; and (4) either actionability of the
> statement irrespective of special harm or the existence of special harm to the plaintiff
> caused by the publication.

*Parrish*, 376 S.C. at 320, 656 S.E.2d at 388 (citations omitted).

Hutson complained at the hearing that TLC stated he filed for bankruptcy but did not explain

why he filed for bankruptcy. Because Hutson *did* file for bankruptcy, however, TLC's statement is

true, and Hutson cannot prevail on a claim of defamation for such a statement. *See Fountain v. First*

*Reliance Bank*, 398 S.C. 434, 442-44, 730 S.E.2d 305, 309-10 (2012). The same can be said of the

other statements contained in the April 3, 2014 letter. The letter indicated that Mr. Hutson "failed

to pay rents he owed to TLC Holdings, LLC and taxes owing to Clarendon County." (Dkt. No. 77-

17.) The Settlement Agreement in the State Court Action–which Mr. Hutson signed–indicated that

Hutson was in arrearage to TLC in the amount of $199,969.19. (*See* Dkt. No. 183-6 at 2 of 10.) Mr.

Hutson stated in his deposition that he " didn't have enough money to pay the taxes on the property

like [he] was supposed to." (Hutson Dep. at 199; Dkt. No. 135.) As to the statement that Hutson

failed to carry insurance, there is undisputed evidence in the record that Hutson did not always carry

insurance. (*See* Clark Dep. at 21-22; Dkt. No. 134.) Similarly, as to the statement in the letter that Hutson failed to pave the roads, Hutson admitted that he did not pave the roads. (Hutson Dep. at 80, 82; Dkt. No. 135.) In the letter of April 3, 2014, TLC states that Hutson "has continued the breaches of the [Lease Purchase] Agreement. (Dkt. No. 77-17.) Of course, that is exactly what Judge James found in the State Court Action in his Order dated March 20, 2014. (*See* Dkt. No. 183-8; Dkt. No. 183-8 at 6 of 12.) Because the undisputed evidence reveals that the statements of which Hutson complains were, in fact, true, Third-Party Plaintiffs are entitled to summary judgment as to Hutson's claim against them for defamation.

### C.    Motion for Summary Judgment (Dkt. No. 228)

Hutson seeks summary judgment as to Third-Party Plaintiffs' claim against him for equitable indemnity. (*See* Dkt. No. 228.)[8] As stated in *Vermeer Carolina's, Inc. v. Wood/Chuck Chipper Corp.*, 336 S.C. 53, 518 S.E.2d 301 (Ct. App. 1999),

> For a party to recover under a theory of equitable indemnification, three things must be proven: (1) the indemnitor was liable for causing the Plaintiff's damages; (2) the indemnitee was exonerated from any liability for those damages; and (3) the indemnitee suffered damages as a result of the Plaintiff's claims against it which were eventually proven to be the fault of the indemnitor.

*Vermeer*, 336 S.C. at 63, 518 S.E.2d at 307. Stated another way, in order for Third-Party Plaintiffs to recover pursuant to a theory of equitable indemnification, Third-Party Plaintiffs must prove that (1) Hutson "was liable for causing the Plaintiff's damages"; (2) Third-Party Plaintiffs were

---

[8]From a reading of Hutson's motion, it is not entirely clear to the undersigned whether Hutson also seeks summary judgment as to his counterclaims against Third-Party Plaintiffs. (*See* Dkt. No. 228.) To the extent Hutson seeks summary judgment as to his counterclaims against Third-Party Plaintiffs, such a request should be denied because, as set forth above, Hutson's counterclaims against Third-Party Plaintiffs fail.

"exonerated from any liability for those damages"; and (3) Third-Party Plaintiffs suffered damages as a result of the Plaintiff's claims against [them] which were eventually proven to be the fault of" Hutson. *See Vermeer*, 336 S.C. at 63, 518 S.E.2d at 307.

In his written filings, Hutson asserts he is entitled to summary judgment on the claim for equitable indemnity because "Third Party Plaintiffs were sued by the Class due to broken promises and fraudulent behaviors by the Third Party Plaintiffs in the years prior to Third Party Defendant's arrival." (Dkt. No. 251 at 16 of 20.) Hutson points to Judge Norton's Order of February 1, 2016 to support his position that Third Party Plaintiffs "convert[ed] the 'club' to a public club and allowed the public onto the property several years prior to 2011." (Dkt. No. 251 at 16 of 20.)

At the hearing, Hutson argued that he is entitled to summary judgment as to Third-Party Plaintiffs' claim for equitable indemnity because the Court can find as a matter of law that TLC is at fault for the circumstances "that we find ourselves here in today." Hutson asserted that TLC violated several South Carolina statutes by not recording the membership agreements or the "purported lease" between Big Water Resort and TLC–which he contends is negligence per se. Hutson argued that negligence per se is fault and that, as a matter of law, TLC is at fault and cannot prevail on its claim for equitable indemnity.

The undersigned recommends denying Hutson's Motion for Summary Judgment (Dkt. No. 228.) Hutson's arguments about Third-Party Plaintiffs' failure to record–while interesting–are red herrings. Even if TLC violated the South Carolina Code in failing to record the membership agreements and the lease between Big Water and TLC, this failure did not cause the *Plaintiffs'* damages. *See Stoneledge at Lake Keowee Owners' Ass'n, Inc. v. Clear View Constr., LLC*, 413 S.C.

615, 619, 625-26, 776 S.E.2d 426, 428, 432 (Ct. App. 2015) (noting that the party seeking equitable indemnification (the general contractor Marick) "cannot recover for equitable indemnity" from Clear View (the subcontractor) "if [Marick] had any fault in causing Stoneledge's damages," where Stoneledge "brought this lawsuit seeking damages resulting from construction defects that allowed water into the townhomes" and "[t]wo of the construction defects alleged by Stoneledge related to the stonework performed by Clear View"). The crux of Plaintiffs' claim is that they were injured when the resort changed from a private resort to a public resort. Simply put, whether lease and the membership agreements were recorded had nothing to do with changing the resort from a private resort to a public resort. Whatever damages Hutson contends he suffered due to the failure to record, it is clear that the *Plaintiffs* suffered no damages.

To the extent Hutson argues that Judge Norton's order of February 1, 2016 supports his position that it was Third-Party Plaintiffs who converted the club from a private club to a public club, the undersigned finds no such support therein.[9] The portion of the Order to which Hutson points provides,

> The Defendants asserted numerous defenses arguing among other things that the conversion of the club to a public club was not a breach of contract and that the public was allowed onto the property several years prior to 2011 which would render all claims time barred by the statute of limitations.

(Dkt. No. 248 at 3 of 10.) The fact that Defendants pled the statute of limitations as a defense does not mean that they cannot also argue that Plaintiffs' damages were caused by a third party, as

---

[9]Hutson also asserts that Third-Party Plaintiffs "have agreed to pay damages/restitution to the Class Members because they are guilty of contract violations for the exclusivity of use to the Class Members." (Dkt. No. 251 at 17 of 20.) However, the Settlement Agreement contains no admission of liability. (*See* Dkt. No. 218-1.)

inconsistent defenses may be pleaded. *See* FED. R. CIV. P. 8(d)(3) ("A party may state as many

separate claims or defenses as it has, regardless of consistency."); *see also Little v. Texaco, Inc.*, 456

F.2d 219, 220 (10th Cir.1972) ("[A] defendant is at liberty to deny and at the same time advance an

affirmative defense.").

Third-Party Plaintiffs contend that Hutson is the one who opened Big Water Resort up to the

public, thereby causing Plaintiffs' damages, and Hutson contends Third-Party Plaintiffs opened Big

Water Resort to the public, thereby causing Plaintiffs' damages. Who in fact opened the resort to

the public–Third-Party Plaintiffs or Hutson–is a classic factual dispute;[10] accordingly, Hutson's

Motion for Summary Judgment as to the claim for equitable indemnity should be denied. *See*

*Stoneledge*, 413 S.C. at 626, 776 S.E.2d at 432 ("Marick cannot recover for equitable indemnity if

it had any fault in causing Stoneledge's damages. We have carefully examined the record in this

case, and we cannot say as a matter of law Marick is at fault. Rather, we find the evidence is

---

[10]The record contains evidence that Big Water Resort was opened to the public before Hutson ever arrived. One of the named Plaintiffs in this case–Bonnie Youmans–testified at her deposition that in 2008 or 2009, she noticed that nonmembers were coming in off I-95 and staying for just one night; she indicated these people were not at the resort for a tour. (Youmans Dep. 14-15, 20; Dkt. No. 91-9.) Ms. Youmans testified that she, along with Linda Hudson and Frances McDonald, consulted an attorney in 2008 or 2009 about a possible class action. (Youmans Dep. 34-35; Dkt. No. 91-9.)

Of course, the record also contains evidence that Hutson was the one who opened the resort to the public. On or about August 19, 2011, Hutson sent a letter to the "Members"; that letter stated, *inter alia* (verbatim),

> Regarding the issue of taking in the public, please let us clear this up. The same as each member use to be (public prior to becoming a member) other outsiders who express an interest are being considered. The only difference is we allow perspective new members to visit our park under trial membership which allows us the opportunity to observe that potential member for longer yearly memberships. All new members will and do pay more money for each visit for campsites and cabin sites. Existing members will always pay far less. The new system will help with the financial growth of Big Water and provide opportunity for Big Water to offer more than ever, with your help and support. . . .

(Dkt. No. 77-23 at 1-2 of 2.) Hutson testified during his deposition that Big Water began to "take every person that we could coming in from the public" about six months after his August 2011 letter (in other words, in early 2012). (Hutson Dep. at 320-21; Dkt. No. 126-1.) He also testified, however, that members complained to him about public access to the resort as early as five or six days after he arrived there. (Hutson Dep. 58-65, 88, 91; Dkt. No. 135.)

33

conflicting, and viewing the evidence in the light most favorable to Marick, the record contains evidence a factfinder could reasonably find supports the conclusion Marick was not at fault. Because of this conflicting evidence, the equitable indemnity cause of action must be remanded for a trial."). While Third-Party Plaintiffs "cannot recover for equitable indemnity if they had any fault in causing Plaintiffs' damages," because the evidence of who is at fault is conflicting, Hutson's motion should be denied. *See id.* at 626, 776 S.E.2d at 432.

## **CONCLUSION**

It is therefore RECOMMENDED, for the foregoing reasons, that Third-Party Plaintiffs' Motion for Sanctions (Dkt. No. 179) be DENIED. It is further RECOMMENDED that Third-Party Plaintiffs' Motion for Summary Judgment (Dkt. No. 183) be GRANTED, and that Third-Party Defendant's Motion for Summary Judgment (Dkt. No. 228) be DENIED.

IT IS SO RECOMMENDED.

_____
MARY GORDON BAKER
UNITED STATES MAGISTRATE JUDGE

April 5, 2016
Charleston, South Carolina


**The parties' attention is directed towards the important notice on the next page.**

34

**Notice of Right to File Objections to Report and Recommendation**

The parties are advised that they may file specific written objections to this Report and Recommendation with the District Judge. **Objections must specifically identify the portions of the Report and Recommendation to which objections are made and the basis for such objections.** "[I]n the absence of a timely filed objection, a district court need not conduct a de novo review, but instead must 'only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation.'" *Diamond v. Colonial Life & Acc. Ins. Co.*, 416 F.3d 310 (4th Cir. 2005) (quoting Fed. R. Civ. P. 72 advisory committee's note).

Specific written objections must be filed within fourteen (14) days of the date of service of this Report and Recommendation. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); *see* Fed. R. Civ. P. 6(a), (d). Filing by mail pursuant to Federal Rule of Civil Procedure 5 may be accomplished by mailing objections to:

**Robin L. Blume, Clerk**
**United States District Court**
**Post Office Box 835**
**Charleston, South Carolina 29402**

**Failure to timely file specific written objections to this Report and Recommendation will result in waiver of the right to appeal from a judgment of the District Court based upon such Recommendation.** 28 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984).